1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

THOMAS EZERKIS,                                )        1:05-CV-1208 LJO JMD HC
                                               )
                        Petitioner,            )
                                               )        FINDINGS AND RECOMMENDATION
        v.                                     )        REGARDING PETITION FOR WRIT OF
                                               )        HABEAS CORPUS
                                               )
G.J. GUIRBINO, et al.,                         )        ORDER DIRECTING CLERK OF COURT
                                               )        TO CHANGE NAME OF RESPONDENT
                        Respondents.           )
_____)

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254.

### BACKGROUND

        Petitioner is currently in the custody of the California Department of Corrections pursuant to
a judgment of the Fresno County Superior Court.  A jury convicted him of first degree murder.  The
trial court sentenced him to 25 years to life in state prison.  (Answer at 2.)

        Petitioner filed an appeal in the California Court of Appeal.  The court affirmed the judgment
in a reasoned opinion.  (Answer at 2; Lodged Docs. A-D.)

        Petitioner filed a petition for review in the California Supreme Court.  The court summarily
denied review.  (Answer at 2; Lodged Docs. E-F.)

        On September 13, 2005, Petitioner filed the instant petition in the Northern District of
California.  On September 23, 2005, the petition was transferred to this Court.  The petition raises

1 the following five grounds for relief: 1) Petitioner's equal protection rights were violated when the

2 prosecution exercised five of its first eight peremptory challenges to exclude potential Hispanic

3 jurors; 2) Petitioner's due process rights were violated by the 30-year delay between the murder and

4 the filing of charges; 3) the exclusion of critical defense evidence prevented Petitioner from

5 advancing his defense theory; 4) Petitioner's due process rights were violated when the trial court

6 refused to instruct the jury on the lesser related offense of accessory to murder; and 5) the cumulative

7 prejudice from the delay in filing charges, the exclusion of defense evidence, and the failure to

8 instruct the jury on accessory to murder resulted in a miscarriage of justice.

9            On November 26, 2007, Respondent filed an answer to the petition.

10           On March 12, 2008, Petitioner filed a traverse to the answer.

11                                   **FACTUAL BACKGROUND[1]**

12           Michael Thomas Garvey managed The Apartments bar. He worked the Saturday night before

13 the shooting. He testified that at the end of the shift he washed all the glasses and ashtrays before

14 going home. He was not able to determine if any money was stolen during the robbery.

15           John J. Smith was one of the first officers to arrive at the scene. A hysterical woman met him

16 at the door. Arax was on the floor near the east end of the bar. A .32-caliber semiautomatic handgun

17 was lying on the floor near him. The gun appeared to be jammed. Arax stated he did not know who

18 shot him, but he had taken the handgun away from that person.

19           Dr. Fitzalbert Michael Marius was a close family friend and was called to treat Arax in the

20 hospital. At the hospital Arax stated that he went to The Apartments to do bookwork. When he

21 came out of his office, he saw two men at the front of the bar. As he headed back to his office, one

22 of the men followed him and drew a gun. A struggle for the gun ensued and Arax was shot. Marius

23 could not recall if Arax stated whether the assailant first threatened him. Arax said another man also

24 was involved. Arax indicated the assailants were White, but he did not know them.

25           William E. Hickman was a detective with the Fresno Police Department when Arax was

26 murdered. He interviewed the doctors at the hospital after Arax died. The doctors reported that

27

28
_____
          [1]  The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of
January 7, 2005 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. D.

1   Arax said he was sitting at his desk doing the books when two men came in and started shooting.

2        Doyle Robinson, who was a technician with the Fresno Police Department's identification

3   bureau, responded to the scene.  He recovered four .32-caliber shell casings, two .32-caliber bullets,

4   and two .38-caliber bullets from the scene.  He also collected the .32-caliber handgun, which had a

5   round jammed in the action.  Robinson created six fingerprint cards from the bar--five from beer

6   glasses and one from a pool cue ball.

7        Dr. Thomas Clint Nelson performed the autopsy on Arax.  He identified five different

8   gunshot wounds: a superficial wound to the head, two wounds to the abdomen, one wound to the

9   right wrist, and one wound to the left thigh.  Each bullet exited Arax's body.  One of the bullets to the

10  abdomen went through a large vein, causing the bleeding that led to Arax's death.  A .32-caliber

11  bullet probably caused three of the wounds, while a .38-caliber bullet may have caused the other two.

12  At least one of the bullets that entered the abdomen was fired from close range.

13       Efforts to match the fingerprints found at the scene with suspects were unsuccessful.  Lewis

14  could not identify the two suspects.  The crime remained unsolved until Young was arrested at a

15  Southern California airport in June 2000.

16       Young had a lengthy criminal record.  Apparently, most of the convictions were drug related.

17  When detained at John Wayne Airport in Orange County, Young gave a false name and refused

18  permission to search his suitcases.  A search warrant was obtained and approximately $350,000 was

19  found in his suitcases.  Young was on felony probation for smuggling drugs at the time.  The money

20  was confiscated and Young was permitted to leave.

21       The following month Young was arrested for possessing over $100,000 in drug money.  After

22  a few months in jail, Young sent a note to Special Agent Steven Hart of the Drug Enforcement

23  Administration (the DEA) that he wanted to discuss providing information to avoid a prison term.

24  During one of several meetings, Young revealed the following information about the case.

25       In the early 1970's, Young was convicted in Michigan for a burglary and sentenced to prison.

26  Petitioner also was incarcerated at the time.  Young and Petitioner grew up in the same neighborhood

27  in Detroit.  The two became friends while in prison.

28       Young escaped from prison and went to Fresno, California.  While in Fresno he met Susan

1   Gage, Buddy Barnard, and Larry Owen Frazier.  He also met Arax at The Apartments.  Young and

2   Gage became romantically involved.  They eventually moved to North Hollywood, where Young

3   was arrested and returned to Michigan.

4           When Young returned to prison, he renewed his friendship with Petitioner.  Young told

5   Petitioner about Gage and Barnard.  When Petitioner said he was going to escape by walking away

6   from a work detail, Young gave Petitioner phone numbers for Gage and Barnard.  Petitioner then did

7   as he said he would and escaped.

8           Petitioner was returned to prison within a year after his escape.  Petitioner told Young that he

9   had met Gage and Frazier in California.  Petitioner said that he went to The Apartments with Silvani

10  to rob Arax while Frazier waited in a car in the parking lot.  Petitioner and Silvani had a drink in the

11  bar and then pulled out their guns and told Arax it was a robbery.  Arax charged the two and was

12  shot.  Petitioner and Silvani ran out of the bar and got away.  Petitioner said that Gage did not know

13  anything about the robbery.  Petitioner said Arax was not supposed to get shot.

14          Petitioner's counsel attacked Young's credibility with his long criminal record and by

15  implying that his testimony was motivated by the possibility of a reward and a desire to avoid prison.

16          Young's information led Fresno Police Department detectives to Gage and Frazier.  Gage

17  testified she was raised in Fresno and often visited The Apartments because it was a popular

18  nightspot.  She met Arax at the bar and enjoyed him.

19          In 1969 Gage moved to Los Angeles.  She met Barnard, Young, and Frazier through a

20  boyfriend.  She had a relationship with Young until he was taken into custody and returned to

21  Michigan.  Later she had a short relationship with Frazier.

22          While in Los Angeles she received a phone call from two men from Michigan who said that

23  Young had given them her number.  She met them after work and took them to her home.  The men

24  appeared to need money.  Frazier stopped by and the three men discussed how to steal money.  The

25  men took a .32-caliber handgun that was left at Gage's house.  In addition, Frazier carried a gun.  The

26  three men left without saying where they were going.  Gage believed that Frazier was going to take

27  the men to steal money and she did not believe she would see them again.

28          The three men returned, one with a bullet hole in his arm.  No one said how the injury

1   occurred.  Gage took him to a free clinic in the area.  The men left the next day and Gage never saw

2   the two men from Michigan again.

3        A week or two later Gage saw Frazier at a party.  Frazier pulled her into a closet and told her

4   that he and the two men had gone to Fresno to rob The Apartments but the robbery had gone bad and

5   Arax was shot.  Frazier told her not to tell anyone.  She agreed because she was afraid of Frazier.

6   Gage became upset and left.

7        Gage never told anyone about the murder until Fresno Police Detective Robert Schiotis

8   contacted her.  Gage initially denied any knowledge of the murder but, when Schiotis revealed

9   information establishing that Frazier had already confessed, she told Schiotis everything she knew.

10   Gage testified she would not have sent anyone to rob The Apartments because Arax was her friend.

11        Frazier was raised in the west Fresno County area.  He knew Arax from The Apartments.  He

12   liked Arax.  As far as Frazier knew, Arax was a legitimate businessman.

13        Frazier admitted he was an outlaw.  He stole cars and took them to Mexico to trade for drugs.

14   He robbed various drug dealers.  Frazier also robbed some businesses after the murder.  He was

15   convicted of assaulting a police officer with a deadly weapon.

16        In approximately 1971 Frazier escaped from Sierra Camp Center, an alternative to prison,

17   and went to Santa Cruz and contacted Gary Bolin.  While in Santa Cruz, Frazier began a relationship

18   with Cheryl Anderson, whom he had known while growing up.  Bolin took Frazier to see Gage in

19   Hollywood.  Frazier began a relationship with Gage.

20        While in Los Angeles, Frazier stole a car (the stolen car) with Bolin and a third man.  Bolin

21   and Frazier drove the car back to Santa Cruz.  Frazier told Anderson he was moving to Los Angeles.

22   Anderson said the police had been to the residence looking for Frazier.

23        Petitioner and Silvani were at Gage's house when Frazier returned to Hollywood.  Gage said

24   that Young told Petitioner and Silvani to call her if they went to California.  Gage said Petitioner had

25   escaped from prison in Detroit and that he and Silvani wanted to make some money.  Gage told

26   Frazier she had been at The Apartment's on New Year's Eve and there should be $5,000 or $6,000 at

27   the bar.  Gage said The Apartments had a safe and she would make sure Arax was there to open the

28   safe.

1   Gage, Petitioner, and Silvani decided they were going to rob The Apartments.  Frazier stated

2   he did not want to do that because the authorities were looking for him and he was well known in

3   Fresno.

4   The next morning Frazier, Petitioner, and Silvani headed to Fresno in the stolen car to rob

5   Arax.  Petitioner and Silvani were given Frazier's .38-caliber revolver and a .32-caliber

6   semiautomatic handgun that was kept at Gage's house.  The plan was for Frazier to drive Petitioner

7   and Silvani to Fresno, show them the location of The Apartments, and then get them out of town.

8   Frazier was to split the proceeds with Petitioner and Silvani.

9   Frazier called Anderson on the way to Fresno and arranged to meet her that evening at a hotel

10  in downtown Fresno because he wanted to use her car.

11  When they arrived, Frazier showed Petitioner and Silvani where The Apartments was located

12  and then took them to a hotel in downtown Fresno.  Frazier arranged to meet them at The

13  Apartments at a prearranged time.  They agreed that after the robbery Petitioner and Silvani would

14  follow Frazier out of town and they would dump the stolen car into the California Aqueduct.  Frazier

15  got out of the car and went inside to meet Anderson.  Petitioner and Silvani left in the stolen car.

16  Frazier and Anderson rented a room.  Once inside the room, Frazier told Anderson he had to

17  meet someone and left in her car.

18  Frazier drove Anderson's car to The Apartments and parked across the street.  The stolen car

19  was parked in front of the bar.  Moments later Petitioner and Silvani ran out of the bar and jumped

20  into the stolen car.  Frazier pulled in front of the stolen car and indicated to Petitioner and Silvani to

21  follow him.  They traveled to the California Aqueduct and got out of the cars.  Petitioner said the

22  robbery had gone bad and Arax had been shot.  Petitioner was mad at Silvani because Silvani lost his

23  gun to Arax.  Silvani said Arax shot him in the arm.  Petitioner said that Arax pulled a Tom Mix,

24  meaning Arax tried to take away Silvani's gun.  They did not have a chance to say it was a robbery,

25  nor did they get any money.

26  Frazier got mad, took the .38-caliber revolver from Petitioner, and threw it into the California

27  Aqueduct.  They also pushed the stolen car into the water.  Frazier took Petitioner and Silvani to a

28  motel in Madera and gave them money to take a bus to Gage's house.  The three agreed they would

1  not tell Gage what happened and made up a story about robbing a liquor store in Santa Cruz instead
2  of robbing The Apartments.

3       Frazier and Anderson spent the night in the hotel.  The next morning they drove to
4  Hollywood in Anderson's car.  After they checked into a motel, Frazier told Anderson he would be
5  back shortly and then left.  Frazier hired a taxi to take him to Gage's house.  He never returned and
6  never saw Anderson again.

7       Petitioner and Silvani arrived at Gage's house right after Frazier.  They took Silvani to a free
8  clinic to seek treatment for his gunshot wound.  Gage introduced the three to a man who arranged for
9  Frazier, Petitioner, and Silvani to rob a drug dealer.  Frazier took Petitioner and Silvani to the San
10 Bernardino Freeway after the robbery so the two could hitchhike out of California.

11      About a week later, Frazier and Gage went to a party.  During the party Frazier took Gage
12 into a small closet and told her what happened.  Gage said she had already figured that out.  The two
13 swore never to tell anyone.  Frazier and Gage broke up about three months later and never saw each
14 other again.

15      When contacted by Schiotis, Frazier thought it was probably about Arax's murder.  Frazier
16 voluntarily accompanied Schiotis back to Fresno.  On the trip he showed Schiotis where the stolen
17 car and .38-caliber revolver had been disposed of in the California Aqueduct.  Frazier also took
18 Schiotis to the location of the motel where he took Petitioner and Silvani.

19      The parties stipulated that a car matching the description of the car described by Frazier was
20 stolen in Southern California a month before the murder and was recovered from the California
21 Aqueduct where indicated by Frazier a month after the murder.

22      Anderson recalled an occasion when Frazier asked her to meet him in Fresno.  They met at
23 and checked into the Del Webb Hotel in downtown Fresno.  Frazier left in her car while she visited
24 with a girlfriend.  She could not recall how long he was gone.  When he returned, he seemed
25 agitated.  The next day they drove to Hollywood in Anderson's car and checked into a motel.  Frazier
26 left in the car and did not return until the next day.  Anderson retrieved her car, drove home, and
27 never saw Frazier again.  Anderson could not recall the date of the meeting or even the time of year.

28      Schiotis interviewed Petitioner in Pennsylvania.  Petitioner said he did not think he had ever

1   been to Fresno but admitted he had visited Southern California with Silvani, a childhood friend.

2   While in California, they visited some towns with which Petitioner was not familiar.  When

3   questioned about the murder, Petitioner replied that he could not be expected to confess and, if there

4   was an explanation about why Arax was shot, it would have to come after a trial.

5          Robert Barbery, a Fresno Police Department identification bureau technician, compared

6   Petitioner's and Silvani's known fingerprints to those recovered from the crime scene.  Barbery

7   positively identified Petitioner's prints from a beer glass and a pool cue ball at the scene and

8   positively identified Silvani's prints from a beer glass at the scene.  Silvani committed suicide in San

9   Diego years before the trial.

10                                    **DISCUSSION**

11  **I.  Jurisdiction**

12         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

13  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

14  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

15  375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

16  Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court,

17  which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

18  Accordingly, the Court has jurisdiction over the action.

19         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

20  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

21  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997),

22  *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997),

23  *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only

24  applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment

25  of the AEDPA; thus, it is governed by its provisions.

26  **II.  Legal Standard of Review**

27         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

28  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

1   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

2         The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

3   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

4   Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of

5   the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

6   clearly established Federal law, as determined by the Supreme Court of the United States" or

7   "resulted in a decision that was based on an unreasonable determination of the facts in light of the

8   evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at

9   70-71; see Williams, 529 U.S. at 413.

10         As a threshold matter, this Court must "first decide what constitutes 'clearly established

11   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,

12   quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

13   must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

14   of the relevant state-court decision."  Id., quoting Williams, 592 U.S. at 412.  "In other words,

15   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set

16   forth by the Supreme Court at the time the state court renders its decision."  Id.

17         Finally, this Court must consider whether the state court's decision was "contrary to, or

18   involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

19   quoting 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant

20   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

21   question of law or if the state court decides a case differently than [the] Court has on a set of

22   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

23   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

24   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

25   that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

26         "[A] federal court may not issue the writ simply because the court concludes in its

27   independent judgment that the relevant state court decision applied clearly established federal law

28   erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

1   federal habeas court making the "unreasonable application" inquiry should ask whether the state

2   court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

3        Petitioner has the burden of establishing that the decision of the state court is contrary to or

4   involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

5   94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states,

6   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

7   decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.

8   1999).

9        AEDPA requires that we give considerable deference to state court decisions. The state

10  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

11  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied,

12  537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

13  **III.  Review of Petitioner's Claims**

14       **A.  Ground One**

15       Petitioner argues that his equal protection rights were violated when the prosecution

16  exercised five of its first eight peremptory challenges to exclude potential Hispanic jurors.

17       This claim was presented in an appeal to the California Court of Appeal, which affirmed the

18  judgment in a reasoned opinion. (Lodged Docs. A-D.) The issue was then raised in a petition for

19  review to the California Supreme Court, which summarily denied review. (Lodged Docs. E-F.) The

20  California Supreme Court, by its "silent order" denying review, is presumed to have denied the

21  claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker,

22  501 U.S. 797, 803 (1991).

23       In rejecting Petitioner's claim, the Court of Appeal found that the trial court did not abuse its

24  discretion, as Petitioner did not demonstrate a strong likelihood that the prospective jurors were

25  challenged because of their group association. The Court of Appeal further found there was

26  substantial evidence showing that race-neutral grounds existed for each of the peremptory challenges

27  at issue. (Lodged Doc. D at 12-18.)

28       The Ninth Circuit has held that California state courts act contrary to clearly established

1  federal law when they analyze whether a prima facie case of discrimination was made using the

2  "strong likelihood" standard rather than the more lenient "inference of discrimination" standard.

3  Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir. 2002); see Boyd v. Newland, 467 F.3d 1139, 1143-

4  44 (9th Cir. 2006); see also Williams v. Taylor, 529 U.S. 362, 405 (2000) ("A state-court decision

5  will certainly be contrary to our clearly established precedent if the state court applies a rule that

6  contradicts the governing law set forth in our cases.").  Here, the Court of Appeal analyzed

7  Petitioner's equal protection claim using the incorrect standard.  (Lodged Doc. D at 12-18.)

8         Respondent argues, however, that the Court should not presume that the California Supreme

9  Court relied on the same incorrect legal standard because, on February 23, 2005, after the Court of

10  Appeal opinion was issued but prior to the California Supreme Court's April 20, 2005 summary

11  denial of Petitioner's claim, the U.S. Supreme Court made clear in *Johnson v. California*, 543 U.S.

12  499 (2005) that the "inference of discrimination" standard was the proper standard.  Respondent

13  argues that it should be presumed that the California Supreme Court was aware of the *Johnson* case

14  and therefore applied the proper standard in adjudicating Petitioner's claim.

15         The U.S. Supreme Court case that disapproved of the "strong likelihood" standard in favor of

16  the "inference of discrimination" standard, however, is actually *Johnson v. California*, 545 U.S. 162

17  (2005), not *Johnson v. California*, 543 U.S. 499 (2005).  Johnson v. California, 545 U.S. 162, 173

18  (2005) ("The facts of this case well illustrate that California's 'more likely than not' standard is at

19  odds with the prima facie inquiry mandated by *Batson*.").  The pertinent *Johnson* case was not

20  decided until June 13, 2005, nearly two months after the California Supreme Court's summary denial

21  of Petitioner's claim.  This Court must therefore presume that the California Supreme Court

22  analyzed Petitioner's *Batson* claim using the wrong legal standard and review Petitioner's claim de

23  novo.  Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir. 2002) ("Because the California state courts

24  applied an incorrect legal standard, contrary to federal law as pronounced in *Batson,* we review

25  petitioner's *Batson* claims de novo.").

26         Purposeful exclusion of jurors on account of race violates the Equal Protection Clause.

27   Batson v. Kentucky, 476 U.S. 79, 84 (1986).  "In *Batson,* we outlined a three-step process for

28  evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal

Protection Clause. . . . First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citations omitted).

To establish a prima facie showing of discrimination, a defendant must show that the prosecution removed members of a cognizable group and that the circumstances raise an inference that the challenges were motivated by race. Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir. 2002). "[A] court must consider the 'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike.  Thus, when a defendant raises a plausible *Batson* claim, a court must analyze the context in which the contested peremptory strike arose." Boyd v. Newland, 467 F.3d 1139, 1146-47 (9th Cir. 2006) (citations omitted).

Here, in response to Petitioner's *Batson* motion, the trial court acknowledged that the prosecution had used five of its eight peremptory challenges to remove individuals that appeared to be Hispanic.  (ART at 170.)  The court stated, however, that the jury pool "appears to be very similar to our community as a whole in terms of Hispanic representation," noting that "the panel as it is currently still situated has at least seven and possibly nine of the twelve in the box from Hispanic background."  (Id.)  The trial court further noted that the defense had excused one or two Hispanic jurors and that Ms. Silva and Ms. Gonzales, who were excused by the prosecution, could have easily been challenged for cause.  (Id.)

A review of the relevant facts and circumstances prior to Petitioner's *Batson* motion supports the trial court's finding that there was no prima facie case of discrimination.  Ms. Silva, during voir dire, stated that she was not comfortable being on the jury and that she did not want to do it.  (ART at 54.)  She further stated, "I don't want to be the one to judge somebody either.  I don't think it's right.  And I don't understand all this stuff.  Hard words.  And I don't know what you guys use." (Id.)  Ms. Gonzales stated that her second cousin had recently been murdered and that she was unsure if it would affect her ability to serve as a juror.  (ART at 141.)  She further stated that she was

1    uncomfortable as a juror because "it's just hard to believe anybody" and that she would need a lot to

2    be convinced.  (ART at 164.)  Ms. Pena did not understand questions regarding the use of immunity

3    to convince accomplices to testify against Petitioner.  (ART at 79.)  Mr. Jaramillo stated that his

4    brother was charged with murder in 1949 and that he does not really like to judge someone else to

5    his standard or the standard of society, although he felt he could be fair.  (ART at 38, 71.)  Mr.

6    Murietta admitted that he had heard a rumor about a prior case in which the prosecutor had

7    prosecuted his employer, resulting in a plea to criminal charges and a multi-million dollar civil

8    settlement, which in turn gave rise to allegations that the prosecutor's actions were racially

9    motivated.  (ART at 127.)

10         Given the fact that the jury pool was largely Hispanic, and considering the answers given by

11   the challenged jurors during voir dire, Petitioner has not raised an inference that the prosecution's

12   use of peremptory challenges to exclude the five prospective, Hispanic jurors was motivated by race.

13         **B.  Ground Two**

14         Petitioner argues that his due process rights were violated by the 30-year delay between the

15   murder and the filing of charges.

16         This claim was presented in an appeal to the California Court of Appeal, which affirmed the

17   judgment in a reasoned opinion.  (Lodged Docs. A-D.)  The issue was then raised in a petition for

18   review to the California Supreme Court, which summarily denied review.  (Lodged Docs. E-F.)  The

19   California Supreme Court, by its "silent order" denying review, is presumed to have denied the

20   claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker,

21   501 U.S. 797, 803 (1991).

22         In rejecting Petitioner's claim, the Court of Appeal found that his due process rights were not

23   violated as there was no evidence that the delay in bringing charges was the result of a tactical

24   decision by the prosecution.  (Lodged Doc. D at 19.)

25         Due process challenges to delay in instituting criminal prosecutions "can prevail only upon a

26   showing that the Government delayed seeking an indictment in a deliberate attempt to gain an unfair

27   tactical advantage over the defendant or in reckless disregard of its probable prejudicial impact upon

28   the defendant's ability to defend against the charges."  U.S. v. Eight Thousand Eight Hundred and

1  Fifty Dollars ($8,850) in U.S. Currency, 461 U.S. 555, 563 (1983); see U. S. v. Lovasco, 431 U.S.

2  783, 795-96 (1977); U.S. v. Marion, 404 U.S. 307, 324-26 (1971).

3         The state court's determination that Petitioner's federal due process rights were not violated

4  was not unreasonable, as Petitioner has not presented evidence showing the prosecution delayed

5  filing charges in an attempt to gain a tactical advantage or in reckless disregard of potential prejudice

6  to Petitioner.  Further, to the extent Petitioner's claim is based on a violation of state law, it is not

7  cognizable on federal habeas.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (citations

8  omitted); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) ( "[A] violation of state law

9  standing alone is not cognizable in federal court on habeas.").

10        **C.  Ground Three**

11        Petitioner argues that the exclusion of critical defense evidence prevented him from

12  advancing his defense theory.  Petitioner claims that the trial court improperly prevented him from

13  cross-examining Larry Frazier regarding a probation report which contradicted Frazier's claim that

14  he had never dumped a vehicle into the California Aqueduct except with Petitioner.  Petitioner

15  further claims that the trial court improperly limited his ability to cross-examine Ronald Young

16  regarding any deals he had with law enforcement to testify against Petitioner.

17        This claim was presented in an appeal to the California Court of Appeal, which affirmed the

18  judgment in a reasoned opinion.  (Lodged Docs. A-D.)  The issue was then raised in a petition for

19  review to the California Supreme Court, which summarily denied review.  (Lodged Docs. E-F.)  The

20  California Supreme Court, by its "silent order" denying review, is presumed to have denied the

21  claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker,

22  501 U.S. 797, 803 (1991).

23        In rejecting Petitioner's claim, the Court of Appeal found that the trial court did not abuse its

24  discretion in limiting cross-examination, as there was no evidence supporting the issues Petitioner

25  wished to raise.  In addition, the Court of Appeal found that any error in limiting cross-examination

26  was harmless, as the issues Petitioner sought to raise were not significant enough to overcome the

27  evidence of his guilt.  (Lodged Doc. D at 29-33.)

28        "State prisoners are entitled to habeas relief under 28 U.S.C. § 2254 only if their detention

violates the Constitution or a federal statute or treaty.  A state court's procedural or evidentiary ruling

is not subject to federal habeas review unless the ruling violates federal law, either by infringing

upon a specific federal constitutional or statutory provision or by depriving the defendant of the

fundamentally fair trial guaranteed by due process." Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.

1995) (citations omitted); see also Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) ( "[A]

violation of state law standing alone is not cognizable in federal court on habeas.").  Further, "the

Constitution permits judges to exclude evidence that is repetitive ..., only marginally relevant[,] or

poses an undue risk of harassment, prejudice, [or] confusion of the issues." Holmes v. South

Carolina, 547 U.S. 319, 326-27 (2006) (quotation marks omitted) (ellipsis in original).

During the cross-examination of Larry Frazier, Petitioner's counsel asked if Mr. Frazier had

ever dumped a vehicle in the Panoche Road Canal prior to doing so in this case.  Mr. Frazier

responded that he had not.  Petitioner's counsel then sought to question Mr. Frazier about a probation

report in which Tony Brown, who was Frazier's co-defendant in a prior case, stated that he and

Frazier dumped a vehicle in the canal on a prior occasion.  (RT at 1540-42.)  Petitioner's counsel

acknowledged that he had not been able to locate Mr. Brown to verify the statements in the probation

report.  (RT at 1543.)  The trial court therefore prohibited further questions about the prior incident

of dumping a vehicle in the canal, explaining that the questions were of questionable relevance, and

in any case were more prejudicial than probative, as Petitioner had no evidence proving the

statements in the report were true.  (RT at 1544-45.)

During the cross-examination of Ronald Young, Petitioner's counsel sought to question Mr.

Young about whether he was excused from performing services for law enforcement, which he had

agreed to perform in a prior case, in exchange for his testimony against Petitioner.  (RT at 1210-11.)

Mr. Young did not admit that such an agreement had been made.  (See RT at 1209.)  Petitioner's

counsel acknowledged that he had no evidence of such an agreement.  (RT at 1212.)  The trial court

therefore found that further questions relating to the alleged agreement lacked relevance and would

cause an undue consumption of the court's time considering the slight probative value.  (RT at

1214.)

The state court's determination was not unreasonable.  Petitioner's counsel acknowledged

1  that he had no evidence of an agreement between Mr. Young and law enforcement and that he had

2  not been able to locate Mr. Brown to verify the statements attributed to him in the probation report.

3  The trial court was therefore justified in finding that the proposed lines of questioning were more

4  prejudicial than probative and would result in an undue consumption of the court's time.  Petitioner

5  has not shown that he was denied a fundamentally fair trial or any other specific constitutional

6  guarantee.

7           **D.  Ground Four**

8           Petitioner argues that his due process rights were violated when the trial court refused to

9  instruct the jury on the lesser related offense of accessory to murder.

10          This claim was presented in an appeal to the California Court of Appeal, which affirmed the

11  judgment in a reasoned opinion.  (Lodged Docs. A-D.)  The issue was then raised in a petition for

12  review to the California Supreme Court, which summarily denied review.  (Lodged Docs. E-F.)  The

13  California Supreme Court, by its "silent order" denying review, is presumed to have denied the

14  claims presented for the same reasons stated in the opinion of the lower court.  <u>Ylst v. Nunnemaker</u>,

15  501 U.S. 797, 803 (1991).

16          In rejecting Petitioner's claim, the Court of Appeal found that a defendant has no unilateral

17  right to an instruction on a lesser related offense.  It further found that there was no evidence

18  supporting the theory of accessory to murder.  (Lodged Doc. D at 33-34.)

19          A state criminal defendant does not have a constitutional right to an instruction on lesser

20  related offenses that are not lesser included offenses under state law.  <u>Hopkins v. Reeves</u>, 524 U.S.

21  88, 96-98 (1998) ("Almost all States . . . provide instructions only on those offenses that have been

22  deemed to constitute lesser included offenses of the charged crime.  We have never suggested that

23  the Constitution requires anything more.") (citations omitted).  Under California law, being an

24  accessory to murder is not a lesser included offense of murder.  <u>People v. Majors</u>, 18 Cal.4th 385,

25  408 (1998); <u>People v. Preston</u>, 9 Cal.3d 308, 319-20 (1973).

26          The state court's determination was therefore not unreasonable, as Petitioner had no

27  constitutional right to an instruction on the lesser related offense of accessory to murder.

28

1

**E.  Ground Five**

2

3     Petitioner argues that the cumulative prejudice from the delay in bringing charges against

4     him, the exclusion of defense evidence, and the failure to instruct the jury on the lesser related

      offense of accessory to murder resulted in a miscarriage of justice

5

6     This claim was presented in an appeal to the California Court of Appeal, which affirmed the

7     judgment in a reasoned opinion.  (Lodged Docs. A-D.)  The issue was not raised, however, in the

8     petition for review filed in the California Supreme Court.  (Lodged Docs. E-F.)  Petitioner has

9     therefore failed to properly exhaust the claim by fairly presenting it to each of the appropriate state

10    courts.  Baldwin v. Reese, 541 U.S. 27, 29 (2004) (stating that, before seeking a federal writ of

11    habeas corpus, a state prisoner must exhaust available state remedies by presenting his claim "in each

      appropriate state court").

12

13    "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the

14    failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. §

15    2254(b)(2).  The Ninth Circuit has interpreted section 2254(b)(2) to allow a federal court to deny an

16    unexhausted petition on the merits "only when it is perfectly clear that the applicant does not raise

17    even a colorable federal claim."  Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005).

18    Here, each of Petitioner's individual claims lack merit for the reasons discussed above.  As

19    Petitioner did not suffer prejudice as a result of the alleged individual errors, he cannot establish

20    cumulative prejudice by combining his claims into a group.  It is therefore perfectly clear that his

21    claim of cumulative prejudice does not raise even a colorable federal claim.

22    **F.  Proper Respondent**

23    Petitioner states that he is currently incarcerated at Centinela State Prison.  (Petition at 1.)

24    Respondent states that the warden of that institution is Victor Almager.  (Answer at 1 n.1.)  Pursuant

25    to Rule 25 of the Federal Rules of Civil Procedure, the Clerk will be directed to substitute Victor

26    Almager as Respondent in this matter.

27
                                    **RECOMMENDATION**
28

      Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

1    DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

2    Respondent.

3          This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

4    United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

5    72-304 of the Local Rules of Practice for the United States District Court, Eastern District of

6    California.  Within thirty (30) days after being served with a copy, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall

9    be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

10   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

11   636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

12   waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

13                                    **ORDER**

14

15         The Court HEREBY ORDERS that the Clerk of Court is DIRECTED to substitute Victor

16   Almager as Respondent in this matter.

17

18   <u>IT IS SO ORDERED.</u>

19

20   **Dated:      October 24, 2008                   /s/ John M. Dixon**
     _____
                                    UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28